# EXHIBIT A

# IN THE COUNTY COURT OF THE EIGHTH JUDICIAL CIRCUIT
# IN AND FOR ALACHUA COUNTY
# CIVIL DIVISION

**JOCELYN BRUTUS,**

    *Plaintiff,*

    v.

**YES COMPANIES FRED, LLC** and **YES HOMESALES, LLC** *collectively d/b/a* **HIDDEN OAKS, YES! COMMUNITIES, LLC, NATIONAL CREDIT SYSTEMS, INC., EXPERIAN INFORMATION SOLUTIONS, INC., EQUIFAX INFORMATION SERVICES, LLC, & TRANSUNION, LLC,**

    *Defendant.*

Case Number:  **01 2024 CC 3178**

JURY TRIAL DEMANDED

## COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW the Plaintiff, JOCELYN BRUTUS ("Mr. Brutus"), by and through his attorneys, Seraph Legal, P.A., and complains of the Defendants, YES COMPANIES FRED, LLC and YES HOMESALES, LLC *collectively dba* HIDDEN OAKS, (the "Landlords") YES! COMMUNITIES, LLC ("YES! Communities"), National Credit Systems, Inc. ("NCS"), Experian Information Solutions, Inc. ("Experian"), Equifax Information Solutions, Inc. ("Equifax"), and TransUnion, LLC ("TransUnion"), collectively referred to as the "Defendants," stating as follows:

## PRELIMINARY STATEMENT

1.      This is an action brought by Mr. Brutus against NCA and YES! Communities for violations of the *Florida Consumer Collection Practices Act*, § 559.55, Fla. Stat., *et seq.* ("FCCPA"), against NCS for violation of the *Fair Debt Collection Practices* Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA"), against YES! Communities for violation of § 48.49(3), Fla. Stat., and against the Defendants except YES! Communities for violation of the *Fair Credit Reporting Act*, 15 U.S.C. § 1681, *et seq.* ("FCRA").

## JURISDICTION AND VENUE

2.      Subject matter jurisdiction arises under the FCRA, 15 U.S.C. § 1681p, the FDCPA, 15 USC 1692k(d), and the FCCPA, § 559.77(1), Fla. Stat.

3.      Defendants are subject to the provisions of the FDCPA, the FCCPA, and the FCRA, and to the jurisdiction of this Court pursuant to § 48.193, Fla. Stat.

4.      Venue is proper in the Alachua County because the acts complained of were committed and / or caused by the Defendants within Alachua County, Florida.

5.      This Court may exercise jurisdiction over the Defendant under Section 48.193, Florida Statutes, as the Defendants conduct regular business within Alachua County.

## PARTIES

### Mr. Jocelyn Brutus

6.     Mr. Brutus is a natural person, and at all times relevant, resided in the City of Gainesville, Alachua County, Florida.

7.     Mr. Brutus is a *consumer* as defined by the FCRA, 15 U.S.C. § 1681a(c), the FDCPA, 15 U.S.C. § 1692a(3), and the FCCPA, § 559.55(8), Fla. Stat.

### Yes! Communities, LLC

8.     YES! Communities is a Delaware foreign limited liability company with a principal place of business address of 5050 S Syracuse St Ste 1200, Denver, CO 80237.

9.     YES! Communities is one of the nation's largest owners and operators of manufactured home communities.

10.     YES! Communities is a portfolio company of real estate funds managed by Stockbridge Capital Group, LLC.

11.     YES! Communities, and its subsidiaries, are engaged in the business of selling, and rent-to-own financing, of manufactured homes across the states, including manufactured homes located within the Hidden Oaks community.

12.     YES! Communities' registered agent is **Cogency Global, Inc.,** and can be served at **600 17th St., Suite 1450S, Denver, CO 80202.**

## YES Companies Fred, LLC & YES Homesales, LLC *d/b/a* Hidden Oaks

13.    YES Companies Fred, LLC and YES Homesales, LLC *collectively d/b/a* Hidden Oaks are Delaware foreign limited liability companies with a principal place of business address of 5050 S Syracuse St Ste 1200, Denver, CO 80237.

14.    The Landlords are registered to conduct business in the State of Florida, and operate under the fictitious name of "Hidden Oaks," "Hidden Oaks – A Manufactured Home Community" and "Hidden Oaks MHP."

15.    Hidden Oaks is located at 100 Castle Drive, Gainesville, Florida, 32607.

16.    The Landlords' Registered Agent is **Cogency Global, Inc.** and they both can be served at **115 N. Calhoun Street, Suite 4, Tallahassee, FL 32301.**

17.    The Landlords are each *Debt Collectors* within the meaning of the FCCPA, § 559.55(7), Fla. Stat., in that it uses instrumentalities of commerce, including postal mail, telephone, the internet, and/or email, interstate and within the State of Florida, for its business, the principal purpose of which is the collection of debts, and/or it regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed to another.

## National Credit Systems, Inc.

18.    NCS is a Georgia foreign profit corporation with a principal business address 3750 Naturally Fresh Boulevard, Atlanta, GA 30349.

19.     NCS is registered to conduct business in the State of Florida, where its Registered Agent is **CT Corporation System, 1200 South Pine Island Road., Plantation, FL 33324.**

20.     NCS is a *Debt Collector* within the meaning of the FDCPA, 15 U.S.C. § 1692a(6), and the FCCPA, § 559.55(7), Fla. Stat., in that it uses instrumentalities of commerce, including postal mail, telephone, the internet, and/or email, interstate and within the State of Florida, for its business, the principal purpose of which is the collection of debts, and/or it regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed to another.

21.     NCS is licensed as *Consumer Collection Agency* ("CCA") by the Florida Office of Financial Regulations, holding license number CCA0900180.

22.     As a licensed Debt Collector in the State of Florida, NCS knows or should know its obligations under the FCCPA and the FDCPA.

### Experian Information Solutions, Inc.

23.     Experian is an Ohio corporation, with a primary business address of 475 Anton Boulevard, Costa Mesa, CA 92626.

24.     Experian is registered to conduct business as a foreign corporation in the State of Florida, and whose Registered Agent is **CT Corporation System, 1200 South Pine Island Road, Plantation, FL 33324.**

25. Experian is a nationwide *Consumer Reporting Agency* ("CRA") within the meaning of the FCRA, 15 U.S.C. § 1681a(f), in that it, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and uses various means of interstate commerce for the purpose of preparing or furnishing consumer reports, specifically including mail and telephone communications.

### Equifax Information Services, LLC

26. Equifax is a Georgia limited liability company with a primary business address of 1550 Peachtree Street NE, Atlanta, GA 30309.

27. Equifax is registered to conduct business as a foreign limited liability company in the State of Florida, where its Registered Agent is **Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301.**

28. Equifax is a nationwide *Consumer Reporting Agency* ("CRA") within the meaning of the FCRA, 15 U.S.C. § 1681a(f), in that it, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and uses various means of interstate commerce for the purpose of

preparing or furnishing consumer reports, specifically including mail and telephone communications.

## TransUnion, LLC

29.     TransUnion is a Delaware limited liability company, with a principal business address of 555 West Adams Street, Chicago, IL 60661.

30.     TransUnion is registered to conduct business as a foreign limited liability company in the State of Florida, where its Registered Agent is **Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301.**

31.     TransUnion is a nationwide *Consumer Reporting Agency* ("CRA") within the meaning of the FCRA, 15 U.S.C. § 1681a(f), in that it, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and uses various means of interstate commerce for the purpose of preparing or furnishing consumer reports, specifically including mail and telephone communications.

## FACTUAL ALLEGATIONS

## YES! Communities

32.     YES! Communities is one of the nation's largest owners and operators of manufactured home communities.

33.    The real estate portfolio owned by YES! Communities is managed by Stockbridge Capital Group, LLC.

34.    YES! Communities also manages a number of other related entities, including Yes Companies Fred, LLC and Yes Homesales, LLC.

35.    YES! Communities, Yes Companies Fred, LLC, and Yes Homesales, LLC all share the same principal place of business in Denver, CO

36.    YES! Communities owns, operates, or has controlling interest in close to 200 communities across the United States with over 40,000 home sites.

37.    In addition to its management role of YES! Communities, Stockbridge Capital Group, LLC, a private equity firm with billions of dollars' worth of assets under management, also has an equity stake in YES! Communities.

38.    As of 2016, Stockbridge Capital Group, LLC and the Government of Singapore Investment Company own at or around seventy percent of YES! Communities.[1]

39.    Yes Homesales, LLC and Yes Companies Fred, LLC operate and manage the Hidden Oaks manufactured home community.

40.    Hidden Oaks, like other mobile home communities operated by YES! Communities and its affiliates and/or subsidiaries, offer a variety of home

---

[1] *YES! Communities Announces Sale of Equity Interest and Consolidation of Portfolios,* https://www.gic.com.sg/wp-content/uploads/2021/04/GIC_News_Release_YES_Communities_Announces_Sale_of_Equity_Interest.pdf

financing and home lease agreements to consumers wishing to purchase a manufactured home, or, more colloquially, a mobile home."[2]

### Mr. Brutus' Rents a Manufactured Home in the YES! Communities' Manufactured Home Community, Hidden Oaks.

41.     Around March 25, 2019, Mr. Brutus spoke with YES! Communities employee, Austin Haynes, and shortly later toured a manufactured home in the Hidden Oaks community, at 825 Victoria Court, Gainesville, FL 32607 (the "Residence"). *See* **Plaintiff's Exhibit A.**

42.     YES! Communities offered to rent the Residence to Mr. Brutus, and gave him an option to purchase it as well. *Id.*

43.     When touring the Residence, Mr. Brutus noticed it had significant damage to both its interior exterior; thus, Mr. Haynes declined to purchase the Residence, but did agree to rent it, provided certain damages were fixed timely.

44.     Mr. Brutus took pictures of the damage, documenting the condition of the residence prior to him moving in. *Id.*

45.     The pictures documented that prior to Mr. Brutus moving in, the Residence: (i) a broken door frame; (ii) had large chunks of sheetrock resting against the living room walls; (iii) had buckets of paint left behind; (iv) had a 2x4 slab of wood left behind; (v) that leaks from the master bathroom were causing

---

[2] YES! Communities' Hidden Oaks community profile, https://www.yescommunities.com/community/hidden-oaks (Accessed October 17, 2023).

water to leak onto the floor and walls of the master bedroom; (vi) there were paint droplets and scratches all over the vinyl floors of the living room; (vii) the shower curtain rod was rusted; (viii) there was a missing light fixture cover in one of the bathrooms; and (ix) some of the light fixtures were covered in rust. *Id.*

46.     Mr. Brutus provided copies of the pictures to Mr. Haynes that same day, letting him know the damage was pre-existing and required attention.

47.     That same day, Mr. Haynes responded to Mr. Brutus, indicating the existing damage was due to the prior owner or tenant, and that YES! Communities should have all repairs and damages fixed by the end of the evening. *Id.*

48.     Based on Mr. Haynes representations, Mr. Brutus signed a 12-month lease on March 26, 2019 with YES Companies Fred, LLC and YES Homesales, LLC d/b/a Hidden Oaks (the "Lease"). *See* **Plaintiff's Exhibit B.**

49.     The Residence was built in 2008, and was manufactured by CMH Manufacturing Inc.

50.     As part of the terms of the Lease, Mr. Brutus was required: (i) pay monthly rent in the amount of $829.68 due on or before the first day of each month; (ii) pay a monthly pest control fee of $5; (iii) pay a monthly waste disposal service charge of $15.32; and (iv) pay a $840 security deposit, of which $100 was non-refundable. *See* **Plaintiff's Exhibit B.**

51.     However, the repairs promised by Mr. Haynes were never performed.

52.     Mr. Brutus called and emailed Hidden Oaks, daily from March 27, 2019 through April 15, 2019, asking Hidden Oaks to send their maintenance workers to fix the damage to the home – damage which Hidden Oaks had assured Mr. Brutus would be fixed and which Mr. Brutus relied upon when he agreed to sign the lease. *See* **Plaintiff's Exhibit A.**

53.     Hidden Oaks continued to fail to fix the damage in Mr. Brutus' home throughout the entire time he leased the Residence.

### YES! Communities Tries to Pin Existing Damage On Mr. Brutus

54.     Despite Hidden Oaks failures to fix the Residence as promised, Mr. Brutus made all rental payments on-time, performing some repairs himself; due to the time and costs of looking for a new place, the costs of moving, the expense of having to put down another security deposit out-of-pocket prior to his deposit with Hidden Oaks being returned (and his concern that Hidden Oaks might not return it at all), Mr. Brutus reluctantly continued to rent the Residence until March 31, 2022.

55.     Around February 23, 2022, Mr. Brutus spoke with Hidden Oaks management and ended up renewing his lease for another year, to start April 1, 2022 and ending March 31, 2023.

56.     On February 23, 2022, Mr. Brutus spoke to James Honeysucker, who is, or was at that time, employed by YES! Communities as a community manager at Hidden Oaks.

57.     During the conversation, Mr. Honeysucker tried to convince Mr. Brutus to purchase the Residence, or another mobile home within the Hidden Oaks community; Mr. Brutus declined, and stated he comfortable renting, only, and that he would renew his lease.

58.     In response, Mr. Honeysucker told Mr. Brutus his rent would increase from around $910 per month to around $1,100 per month, and that Mr. Brutus would have to come back to the office the following week and speak with "Cory," a leasing agent, to sign the lease renewal.

59.     Per Mr. Honeysucker's instructions, Mr. Brutus intended to wait until February 28, 2022 to return to the office to sign the renewal.

60.     However, around February 25, 2022, Mr. Brutus received a letter from YES! Communities stating he was required to vacate his home by April 1, 2022, the end of the current lease term. *See* **Plaintiff's Exhibit C.**

61.     Mr. Brutus was shocked after receiving this letter, since less than 48 hours prior Mr. Honeysucker had said Mr. Brutus could renew his lease by coming in and speaking with "Cory."

62.     Nevertheless, Mr. Brutus uprooted his entire family, including two young children who were under the age of 10 at that time, and left the Residence.

63.     Mr. Brutus took pictures of the Residence, which show he left the residence in *better condition than when he moved in*. **See Plaintiff's Exhibit D.**

64.     On April 2, 2022, YES! Communities conducted an "inspection" of the premises and drafted a "Statement of Deposit" listing a plethora of non-existent "damages," or old damages which occurred prior to Mr. Brutus moving in, and claimed Mr. Brutus owed YES! Communities $6,075 due to damages he supposedly had caused to the Residence during his three-year tenancy. ***See* Plaintiff's Exhibit E.**

65.     A review of the Statement of Deposit shows YES! Communities fraudulently charged Mr. Brutus for thousands of dollars' worth of "repairs" which were either not made, or for which Mr. Brutus was not liable.

66.     For example, YES! Communities statement indicated "all house need to be painting price only for paint $100.00 for 5 gallon bucket (this house only need 1-5 gallon) $100.00" (SIC).

67.     Interior paint on the lower end of the quality spectrum will last between 5 to 7 years; Mr. Brutis occupied the home for four years and the paint was far from new when he moved in.

68.     Thus, YES! Communities fraudulently and unfairly painted – no pun intended – Mr. Brutus as having "damaged" something which had simply reached the end of its useful life and required replacement by the landlord.

69.     Further, even assuming, *arguendo*, that Mr. Brutus was liable for the cost of a new paint job, YES! Communities charged him an amount which greatly exceeded its actual cost.

70.     Lowes, one of the largest home-improvement chains in the nation, states on their website "paint usually is applied at 350 to 400 square feet per gallon[3]."

71.     Thus, five gallons of paint would have covered roughly 1500 square feet, far larger than Mr. Brutus' rental unit.

72.      Yet, the Comparison Report provided by YES! Communities charged Mr. Brutus the exact same charge *seven* times, totaling $700.00. *Id.*

73.     The Comparison Report provided by YES! Communities also charged him $10 for a "light fixture rusty" (SIC) five times and $420 for "light fixture need replace" (SIC). *Id.*

74.     As aforementioned, these issues were pre-existing and Austin Haynes had promised to have them replaced. **See Plaintiff's Exhibit A.**

---

[3] https://www.lowes.com/n/calculators/paint-calculator, accessed April 25, 2024

75.     The Comparison Report provided by YES! Communities charged a total of $3,000 for carpet replacement, although the plain reading of the Comparison Report indicates the cost was $750, and the charge assessed four times.

76.     The Comparison Report stated "living room and 3 bedroom need carpets replace $750." (SIC) *Id*.

77.     The lifespan of indoor carpet is between 5 and 15 years, depending upon the quality of the carpet, the kind of carpet cushion used, and the amount of foot traffic on the carpet, among other factors[4].

78.     The carpet was not new when Mr. Brutus moved into the unit in March 2019; likewise, the quality of the carpet was on the lower end of the spectrum, meaning its lifespan would likely be to the lower end of the 5 to 15 year range.

79.     Mr. Brutus took good care of his rental unit and took reasonable and proper care of the carpet; the carpet was in reasonable condition given its age and expected lifespan when he moved out.

80.     Once again, YES! Communities fraudulently and unfairly claimed Mr. Brutus had "damaged" something which had simply reached the end of its useful life and required replacement by the landlord.

---

[4] https://www.carpetone.com/flooring-guide/product-carpet/carpet-replacement, Accessed April 25, 2024

81.    In Mr. Brutus's 2019 email exchange with Hidden Oaks, he complained water leaking into multiple areas of his home, including those that were carpeted. **See Plaintiff's Exhibit A.**

82.    But, even assuming, *arguendo*, that Mr. Brutus was liable for the cost new carpet, YES! Communities charged him an amount which greatly exceeded their actual cost.

83.    Lower-priced carpets cost around $1 per square foot, according to The Home Depot with carpet padding adding another $.61. This price includes installation.[5]

84.    Thus, the cost of re-carpeting the roughly 400 square feet of carpet in Mr. Brutus' unit should have cost well under $750 – nowhere close to the $3,000 YES! Communities ultimately charged him.

85.    Of note, YES! Communities did not attempt to charge Mr. Brutus the difference between the depreciated value of the existing carpeting and the new carpeting, essentially taking the opportunity to replace used carpeting with new on Mr. Brutus' dime.

86.    The Comparison Report provided by YES! Communities charged $680 for "flooring in living room, dining room, kitchen, hallway and bath room need to be replaced (cost is $680.00 only for the vinyl)." (SIC)

---

[5] https://www.homedepot.com/services/c/cost-install-carpet/b76e9e302, Accessed April 25, 2024

87.     Yet, this charge appears on the Comparison Report twice, meaning YES! Communities charged him $1,360 for materials which covered all potentially affected rooms in the house and cost, by its own calculation, $680.

88.     In Mr. Brutus's 2019 email exchange with Hidden Oaks, he included a picture showing paint splatter on the floor. **See Plaintiff's Exhibit A.**

89.     Vinyl flooring typically will last 10 to 25 years, depending on the quality of the flooring, thickness, and other factors.[6]

90.     On information and belief, the vinyl flooring was the original flooring installed when the until was manufactured in 2008, meaning it was 11 years old when Mr. Brutus moved in and 14 years old when he moved out.

91.     The quality of the vinyl flooring was on the lower end of the spectrum.

92.     Even assuming, *arguendo*, Mr. Brutus had damaged the flooring and was responsible for replacing it, YES! Communities did not attempt to charge Mr. Brutus the difference between the depreciated value of the existing flooring and the new flooring, once again taking the opportunity to replace decade-and-half old flooring with new flooring, on Mr. Brutus' dime.

---

[6] https://www.nationalfloorsdirect.com/learn/articles/How-Long-Does-Vinyl-Plank-Flooring-Really-Last, Accessed April 25, 2024.

93.     The Comparison Report provided by YES! Communities charged $1,300 for "all cabinet and counter top need replace" (SIC), and $135 for "since with faucet need replace" (SIC).

94.     Photos taken by Mr. Brutus on move-out show the countertops and cabinets to be in reasonable condition given their age and normal wear-and-tear.

95.     On information and belief, neither the kitchen countertops nor cabinets had ever been replaced, and were the original sets installed when the house was manufactured in 2008.

96.     In an increasingly-familiar pattern, even if Mr. Brutus had damaged the cabinets and countertops and was responsible for replacing them, YES! Communities did not attempt to charge Mr. Brutus the difference between the depreciated value of the existing the cabinets and countertops and the new the cabinets and countertops, once again taking the opportunity to replace decade-and-half old materials with new ones, leaving Mr. Brutus to foot the bill.

97.     The Comparison Report provided by YES! Communities charged $10 because the living room window "No have blind" (SIC).

98.     Yet, pictures taken by Mr. Brutus at move-out show there were blinds in the living room – the same ones there when he moved in.

99.    The Comparison Report provided by YES! Communities charged two more $10 fees ($20) because a bathroom window had "No window blind" (SIC), even though no window blinds were in place when Mr. Brutus moved in.

100.    Curiously, both charges are categorized as "plumbing," although a different $20 charge for "window blind broken" in Bedroom 2 was categorized as "window."

101.    Mr. Brutus took pictures of the home when he moved out on April 1, 2022, and all of the items alleged to have been "damaged" were reasonably in the same state and condition as when he first took possession of the home in March 2019. *See* **Plaintiff's Exhibit D.**

102.    Moreover, paragraph 5 of the Lease Agreement, titled "Repairs and Alterations," states: "Tenant will pay all 'minor repairs' which are defined as those repairs whose total cost is less than $50.00 (including both labor and materials)… Landlords will pay for all other repairs and maintenance, except for those repairs caused by negligence or intentional destructive acts of Tenant(s) members of Tenant(s) family or person . . . [and] Tenant will not make or permit to be made any alterations, additions, improvements or changes in the premises without in each case the written consent of Landlords." *See* **Plaintiff's Exhibit B.**

103.   At no point did Mr. Brutus damage anything in his house due to negligence or intentional destructive acts, and left the house in the same condition (or better) than it originally was.

104.   Based on the language of the Lease Agreement, all of the YES! Communities charged to Mr. Brutus, totaling $6,815, were the responsibility of YES! Communities, as (1) the paint, countertops, flooring, and cabinets exceeded $50 and, if they needed replacing, were due to normal wear-and-tear; and (2) items under $50, such as charges for rusty light fixtures, were pre-existing when Mr. Brutus moved into the home.

105.   At or around April 26, 2022, YES! Communities listed the Residence on Craigslist.com and yescommunities.com, for sale at $45,000, noting it had been newly remodeled. **See Plaintiff's Exhibit F.**

106.   In a for-sale listing on YES! Communities' website, the listing states "this home has <u>a brand-new</u> kitchen, carpets, floorings, washer and dryer hookups." ***Id.***

107.   YES! Communities clearly intended to profit from recent renovations, not simply be reimbursed its costs.

108.   YES! Communities then expensed this cost ***in full*** to Mr. Brutus.

## Mr. Brutus Disputes Of Debt

109.  On April 27, 2022, Mr. Brutus hired legal counsel and had his attorney send correspondence to YES! Communities, disputing the $6,812 in damages it claimed Mr. Brutus was liable for concerning the property and noting the double-billing and other problems with the accounting.

110.  The letter also demanded the return of Mr. Brutus' $840 security deposit.

111.  Copies of the letter were sent certified mail to Hidden Oaks in Gainesville as well as a carbon-copy to YES! Communities main address in Michigan.

112.  Certified mail receipts show both letters were delivered to Hidden Oaks and YES! Communities on or around April 28, 2022.

113.  Per §83.49(3)(a), Florida Statutes, YES! Communities was required to send notice of its intent to withhold Mr. Brutus' $840 security deposit *by certified mail* within 30 days.

114.  YES! Communities did not send any notice by certified mail as required by law.

115.  Nonetheless, Mr. Brutus' responded, via attorney, within one day of receiving YES! Communities' demand for payment of more than $6,000.

116.    Per §83.49(3)(b), Florida Statutes, YES! Communities could only withhold the $840 security deposit if Mr. Brutus did not object within 15 days of receiving notice of intent to withhold his deposit.

117.    Mr. Brutus timely objected and was unequivocal in his dispute of owning anything, and demanded that his deposit be returned.

118.    YES! Communities did not return his deposit and thus violated §83.49(3)(b), Florida Statutes.

119.    The FCCPA and the FDCPA defines a *Debt* as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." *See*, § 559.55(6), Fla. Stat; *see also*, 15 U.S.C. § 1692a(5).

120.    Thus, the debt alleged owed by the Defendants is a "debt" as defined by the FCCPA and FDCPA.

121.    In the letter sent by Mr. Brutus to Hidden Oaks and YES! Communities, Mr. Brutus clearly disputed the validity of the debt, and delineated the multitude of fraudulent charges and discrepancies contained within the "Statement of Deposit."

122.    However, upon information and belief, neither Hidden Oaks nor YES! Communities responded to Mr. Brutus letters.

123.    In September 2022, YES! Communities placed the debt with NCS for collection, instructing it to collect $6,075 from Mr. Brutus.

124.    NCS reported the Debt as a purported unpaid "collection" account to at least three nationwide CRAs, including Equifax, Experian and Trans Union. See **Plaintiff's Exhibit G through I**.

125.    Mr. Brutus disputed the accuracy of NCS' reporting to Equifax, Experian and Trans Union multiple times, including detailed, written disputes to all three on June 13, 2023.

126.    Mr. Brutus provided a detailed explanation of why the reporting by NCS was inaccurate, including a three-page affidavit detailing the spurious charges alleged owed.

127.    The CRAs, upon receipt of the disputes, scanned them and electronically delivered them to contractors overseas, who within a matter of a few minutes or less skimmed the disputes and sent NCS an *Automated Consumer Dispute Verification* Request ("ACDV") through a system known as e-OSCAR, requesting that NCS make a reasonable investigation into the dispute.

128.   None of the CRAs made any independent investigation of the Mr. Brutus' disputes and relied exclusively on NCA's ACDV responses to comprise their "investigations."

129.   NCS responded to the three ACDVs and in each instance indicated its tradeline should continue to report without any change.

130.   NCS failed to make any meaningful investigation concerning Mr. Brutus' dispute, and simply verified the account balance reporting to the CRAs matched what its own internal systems showed.

131.   NCS takes the position that its landlord clients are correct, even when confronted with substantial proof of inaccuracy by the consumer.

132.   In at least one prior instance, NCS refused to make any adjustment to a purported deficiency balance even when a consumer meritoriously disputed the accuracy of the balance due to the application of a security deposit being erroneously applied as a debit, instead of a credit, claiming basic mathematics called for a "legal judgment" beyond its purview. See *Natasha Sanders vs. National Credit Systems, Inc.*, case 2022CC-00009, Polk County, Florida, January 14, 2022.

133.   In the instant matter, NCS was not required to exercise any legal judgment, and the facts relevant to his dispute were objectively verifiable.

134.   Despite detailed and significant evidence $6,075 was not owed, NCS simply rubber-stamped its reporting as accurate without any investigation into if its client position could be supported beyond its "word" that it was owed.

135.   The FCRA requires that each CRA conduct its own investigation of a consumer dispute. 15 U.S.C. § 1681i.

136.   Thus, upon receipt of Mr. Brutus' disputes of the NCS tradeline, Experian, Equifax, and Trans Union were each legally required to investigate the dispute.

137.   However, each CRA relied solely upon the ACDVs furnished to NCS and the responses thereto.

138.   For at least the last 35 years, courts in this district have recognized that a CRA must make some independent reinvestigation of its own. *See Swoager v. Credit Bureau of Greater St. Petersburg*, 608 F. Supp. 972 (M.D.Fla.1985).

139.   The CRAs' dispute resolution systems are heavily structured to believe data furnishers over consumers when the two parties provide conflicting information.

140.   The CRAs generate revenue by charging data furnishers to report accounts, whereas the CRAs generally make little, if any, money from most consumers directly.

141.   As a result, consumers like Mr. Brutus are left in a scenario where the only way to have their credit report corrected rests on their ability to disprove a negative.

142.   Equifax, Experian, and Trans Union each failed to conduct a reasonable investigation into Mr. Brutus' disputes, as any reasonable investigation would have concluded that Mr. Brutus' did not have a debt to $6,025, and this information could not be objectively verified.

143.   Further, Equifax, Experian, and Trans Union did almost nothing but pass a dispute on, without so much as even reading the dispute in full.

144.   At the minimum, Mr. Brutus' four-page overview of why the Debt was not owed created substantial doubt as to if NCS' information could be objectively verified as accurate, yet each of the three CRAs made no evaluation of their own, and requested nothing from NCS other than an electronically-checked box confirming the data was "verified as accurate."

145.   Mr. Brutus has spent considerable time as direct result of NCS' inaccurate, false tradeline haunting his report, including the inability to apply for new rental housing due to NCS' tradeline appearing on his credit reports.

146.   Mr. Brutus applied for a loan with Vystar Credit on May 10, 2023 and while he was approved, he was not approved for the optimal terms due to the

collection account reporting on his consumer reports. **SEE PLAINTIFF'S EXHIBIT J.**

147.   Further, Mr. Brutus and has spent considerable time disputing the inaccuracies to the CRAs and investigating alternative ways to deal with the issue since disputes pursuant to the FCRA have failed.

148.   Mr. Brutus has also suffered emotional distress from this frustrating and protracted series of events.

149.   Mr. Brutus has hired the aforementioned law firm to represent him in this matter and has assigned his right to fees and costs to such firm.

## COUNT I
## WILLFUL VIOLATIONS OF THE FCRA, 15 U.S.C. § 1681s-2(b)
## NCS Only

150.   Mr. Brutus hereby incorporates paragraphs 1 – 149 as if fully stated herein.

151.   NCS violated 15 U.S.C. § 1681s-2(b) when it failed, on at least six separate occasions, to conduct a reasonable investigation after receiving notice of dispute of the Debt from Experian, Equifax and/or Trans Union, as any reasonable investigation would have concluded that the Debt could not be verified as accurate, as it contained numerous and substantial charges for repairs which even a cursory examination of the documentation purporting to substantiate the charges reveals to be problematic.

152.   NCS's conduct was a result of its regular policies and procedures, which frequently result in the verification of reported information as accurate, when it is not, and as undisputed, or previously disputed, when still disputed.

153.   NCS's conduct was thus willful and intentional, or, alternately, was done with a reckless disregard for its duties under the FCRA to make reasonable investigations, and its policies could reasonably be foreseen to cause harm to Mr. Brutus.

154.   Accordingly, pursuant to 15 U.S.C. § 1681n, NCS is liable to Mr. Brutus for the greater of her actual damages and statutory damages of up to $1,000 for each occurrence, as well as punitive damages, reasonable attorney's fees, and costs.

**WHEREFORE,** Mr. Brutus respectfully requests this Honorable Court to enter judgment against NCS for:

a.   The greater of statutory damages of $1,000 per incident or Mr. Brutus's actual damages, pursuant to 15 U.S.C. § 1681n(a)(1)(A);

b.   Punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

c.   Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. § 1681n(a)(3); and,

d.   Such other relief that this Court deems just and proper.

## COUNT II
## NEGLIGENT VIOLATIONS OF THE FCRA, 15 U.S.C. § 1681s-2(b)
## NCS Only
## In the Alternative to Count I

155.   Mr. Brutus hereby incorporates paragraphs 1 – 149 as if fully stated herein.

156.   NCS violated 15 U.S.C. § 1681s-2(b) when it failed, on at least six separate occasions, to conduct a reasonable investigation after receiving notice of dispute of the Debt from Experian, Equifax and/or Trans Union, as any reasonable investigation would have concluded that the Debt could not be verified as accurate, as it contained numerous and substantial charges for repairs which even a cursory examination of the documentation purporting to substantiate the charges reveals to be problematic.

157.   NCS's conduct was a result of its regular policies and procedures, which frequently result in the verification of reported information as accurate, when it is not, and as undisputed, or previously disputed, when still disputed.

158.   NCS owed Mr. Brutus a legal duty to reasonably investigate her disputes.

159.   NCS breached this duty when it verified its reported information as accurate, and without indicating Mr. Brutus disputed the information.

160.    NCS's conduct was therefore negligent, and pursuant to 15 U.S.C. § 1681o, NCS is liable to Mr. Brutus for her actual damages, as well as her reasonable attorney's fees, and costs.

**WHEREFORE,** Mr. Brutus respectfully requests this Honorable Court to enter judgment against NCS for:

a.    Mr. Brutus's actual damages pursuant to 15 U.S.C. § 1681o(a)(1);

b.    Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. § 1681o(a)(2); and,

c.    Such other relief that this Court deems just and proper.

## COUNT III
## WILLFUL VIOLATIONS OF THE FCRA - 15 U.S.C. § 1681i(a)(1)(A)
### Experian Only

161.    Mr. Brutus hereby incorporates paragraphs 1 – 149 as if fully stated herein.

162.    Experian violated 15 U.S.C. § 1681i(a)(1)(A) when it failed to conduct a reasonable investigation into disputes of the NCS tradeline by Mr. Brutus, since any reasonable investigation would have concluded that the NCS tradeline could not be objectively verified as accurate, in light of a four-page overview of the inaccuracies concerning the debt submitted by Mr. Brutus, when the only "evidence" of accuracy Experian possessed was a single box clicked on an ACDV form marked "verified as accurate" and nothing else.

163.    Experian's conduct was a result of its regular policies and procedures, which frequently result in the verification of reported information as accurate, when it is not, and as undisputed, or previously disputed, when still disputed.

164.    Experian's conduct was thus willful and intentional, or, alternately, was done with a reckless disregard for its duties under the FCRA to make reasonable investigations, and its policies could reasonably be foreseen to cause harm to Mr. Brutus.

165.    Accordingly, pursuant to 15 U.S.C. § 1681n, Experian is liable to Mr. Brutus for the greater of her actual damages and statutory damages of up to $1,000 for each occurrence, as well as punitive damages, reasonable attorney's fees, and costs.

**WHEREFORE,** Mr. Brutus respectfully requests this Honorable Court to enter judgment against Experian for:

a.    The greater of statutory damages of $1,000 per incident or Mr. Brutus's actual damages, pursuant to 15 U.S.C. § 1681n(a)(1)(A);

b.    Punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

c.    Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. §1681n(a)(3); and,

d.    Such other relief that this Court deems just and proper.

## COUNT IV
## NEGLIGENT VIOLATIONS OF THE FCRA - 15 U.S.C. § 1681i(a)(1)(A)
## Experian Only
## In the Alternative to Count III

166.   Mr. Brutus hereby incorporates paragraphs 1 – 149 as if fully stated herein.

167.   Experian violated 15 U.S.C. § 1681i(a)(1)(A) when it failed to conduct a reasonable investigation into disputes of the NCS tradeline by Mr. Brutus, since any reasonable investigation would have concluded that the NCS tradeline could not be objectively verified as accurate, in light of a four-page overview of the inaccuracies concerning the debt submitted by Mr. Brutus, when the only "evidence" of accuracy Experian possessed was a single box clicked on an ACDV form marked "verified as accurate" and nothing else.

168.   Experian's conduct was a result of its regular policies and procedures, which frequently result in the verification of reported information as accurate, when it is not, and as undisputed, or previously disputed, when still disputed.

169.   Experian owed Mr. Brutus a legal duty to reasonably investigate her disputes.

170.   Experian breached this duty when it verified the NCS and BOA accounts as accurate, and without indicating Mr. Brutus disputed the information.

171.    Experian's conduct was therefore negligent, and pursuant to 15 U.S.C. § 1681o, Experian is liable to Mr. Brutus for her actual damages, as well as her reasonable attorney's fees, and costs.

**WHEREFORE,** Mr. Brutus respectfully requests this Honorable Court to enter judgment against Experian for:

a.      Mr. Brutus's actual damages pursuant to 15 U.S.C. § 1681o(a)(1);

b.      Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. §1681o(a)(2); and,

c.      Such other relief that this Court deems just and proper.

### COUNT V
### WILLFUL VIOLATIONS OF THE FCRA - 15 U.S.C. § 1681i(a)(1)(A)
### Trans Union Only

172.    Mr. Brutus hereby incorporates paragraphs 1 – 149 as if fully stated herein.

173.    Trans Union violated 15 U.S.C. § 1681i(a)(1)(A) when it failed to conduct a reasonable investigation into disputes of the NCS tradeline by Mr. Brutus, since any reasonable investigation would have concluded that the NCS tradeline could not be objectively verified as accurate, in light of a four-page overview of the inaccuracies concerning the debt submitted by Mr. Brutus, when the only "evidence" of accuracy Trans Union possessed was a single box clicked on an ACDV form marked "verified as accurate" and nothing else.

174.    Trans Union's conduct was a result of its regular policies and procedures, which frequently result in the verification of reported information as accurate, when it is not, and as undisputed, or previously disputed, when still disputed.

175.    Trans Union's conduct was thus willful and intentional, or, alternately, was done with a reckless disregard for its duties under the FCRA to make reasonable investigations, and its policies could reasonably be foreseen to cause harm to Mr. Brutus.

176.    Accordingly, pursuant to 15 U.S.C. § 1681n, Trans Union is liable to Mr. Brutus for the greater of her actual damages and statutory damages of up to $1,000 for each occurrence, as well as punitive damages, reasonable attorney's fees, and costs.

**WHEREFORE,** Mr. Brutus respectfully requests this Honorable Court to enter judgment against Trans Union for:

a.    The greater of statutory damages of $1,000 per incident or Mr. Brutus's actual damages, pursuant to 15 U.S.C. § 1681n(a)(1)(A);

b.    Punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

c.    Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. §1681n(a)(3); and,

d.    Such other relief that this Court deems just and proper.

## COUNT VI
## NEGLIGENT VIOLATIONS OF THE FCRA - 15 U.S.C. § 1681i(a)(1)(A)
## Trans Union Only
## In the Alternative to Count V

177.    Mr. Brutus hereby incorporates paragraphs 1 – 149 as if fully stated herein.

178.    Trans Union violated 15 U.S.C. § 1681i(a)(1)(A) when it failed to conduct a reasonable investigation into disputes of the NCS tradeline by Mr. Brutus, since any reasonable investigation would have concluded that the NCS tradeline could not be objectively verified as accurate, in light of a four-page overview of the inaccuracies concerning the debt submitted by Mr. Brutus, when the only "evidence" of accuracy Trans Union possessed was a single box clicked on an ACDV form marked "verified as accurate" and nothing else.

179.    Trans Union's conduct was a result of its regular policies and procedures, which frequently result in the verification of reported information as accurate, when it is not, and as undisputed, or previously disputed, when still disputed.

180.    Trans Union owed Mr. Brutus a legal duty to reasonably investigate her disputes.

181.    Trans Union breached this duty when it verified the NCS and BOA accounts as accurate, and without indicating Mr. Brutus disputed the information.

182.    Trans Union's conduct was therefore negligent, and pursuant to 15 U.S.C. § 1681o, Trans Union is liable to Mr. Brutus for her actual damages, as well as her reasonable attorney's fees, and costs.

**WHEREFORE,** Mr. Brutus respectfully requests this Honorable Court to enter judgment against Trans Union for:

a.    Mr. Brutus's actual damages pursuant to 15 U.S.C. § 1681o(a)(1);

b.    Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. §1681o(a)(2); and,

c.    Such other relief that this Court deems just and proper.

## COUNT VII
## WILLFUL VIOLATIONS OF THE FCRA - 15 U.S.C. § 1681i(a)(1)(A)
### Equifax Only

183.    Mr. Brutus hereby incorporates paragraphs 1 – 149 as if fully stated herein.

184.    Equifax violated 15 U.S.C. § 1681i(a)(1)(A) when it failed to conduct a reasonable investigation into disputes of the NCS tradeline by Mr. Brutus, since any reasonable investigation would have concluded that the NCS tradeline could not be objectively verified as accurate, in light of a four-page overview of the inaccuracies concerning the debt submitted by Mr. Brutus, when the only "evidence" of accuracy Equifax possessed was a single box clicked on an ACDV form marked "verified as accurate" and nothing else.

185.   Equifax's conduct was a result of its regular policies and procedures, which frequently result in the verification of reported information as accurate, when it is not, and as undisputed, or previously disputed, when still disputed.

186.   Equifax's conduct was thus willful and intentional, or, alternately, was done with a reckless disregard for its duties under the FCRA to make reasonable investigations, and its policies could reasonably be foreseen to cause harm to Mr. Brutus.

187.   Accordingly, pursuant to 15 U.S.C. § 1681n, Equifax is liable to Mr. Brutus for the greater of her actual damages and statutory damages of up to $1,000 for each occurrence, as well as punitive damages, reasonable attorney's fees, and costs.

**WHEREFORE,** Mr. Brutus respectfully requests this Honorable Court to enter judgment against Equifax for:

a.   The greater of statutory damages of $1,000 per incident (for a total of $2,000, based on information pled at the time of filing) or Mr. Brutus's actual damages, pursuant to 15 U.S.C. § 1681n(a)(1)(A);

b.   Punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

c.   Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. §1681n(a)(3); and,

d.   Such other relief that this Court deems just and proper.

## COUNT VIII
## NEGLIGENT VIOLATIONS OF THE FCRA - 15 U.S.C. § 1681i(a)(1)(A)
## Equifax Only
## In the Alternative to Count VII

188.   Mr. Brutus hereby incorporates paragraphs 1 – 149 as if fully stated herein.

189.   Equifax violated **15 U.S.C. § 1681i(a)(1)(A)** when it failed to conduct a reasonable investigation into disputes of the NCS tradeline by Mr. Brutus, since any reasonable investigation would have concluded that the NCS tradeline could not be objectively verified as accurate, in light of a four-page overview of the inaccuracies concerning the debt submitted by Mr. Brutus, when the only "evidence" of accuracy Equifax possessed was a single box clicked on an ACDV form marked "verified as accurate" and nothing else.

190.   Equifax's conduct was a result of its regular policies and procedures, which frequently result in the verification of reported information as accurate, when it is not, and as undisputed, or previously disputed, when still disputed.

191.   Equifax owed Mr. Brutus a legal duty to reasonably investigate her disputes.

192.   Equifax breached this duty when it verified the NCS and BOA accounts as accurate, and without indicating Mr. Brutus disputed the information.

193.   Equifax's conduct was therefore negligent, and pursuant to 15 U.S.C. § 1681o, Equifax is liable to Mr. Brutus for her actual damages, as well as her reasonable attorney's fees, and costs.

**WHEREFORE,** Mr. Brutus respectfully requests this Honorable Court to enter judgment against Equifax for:

a.   Mr. Brutus's actual damages pursuant to 15 U.S.C. § 1681o(a)(1);

b.   Reasonable costs and attorneys' fees pursuant to pursuant to 15 U.S.C. §1681o(a)(2); and,

c.   Such other relief that this Court deems just and proper.

### COUNT IX
### <u>VIOLATIONS OF THE FCCPA, § 559.72(9), FLA. STAT.</u>
### <u>NCS Only</u>

194.   Mr. Brutus adopts and incorporates paragraphs 1 – 149 as if fully stated herein.

195.   NCS violated Section 559.72(9), Florida Statutes, when NCS asserted a debt was legitimate when it knew it was not, when it continued to attempt to collect the Debt from Mr. Brutus, despite detailed and meritorious dispute of accuracy.

196.   NCS is liable for the above-stated violations of the FCCPA, and Mr. Brutus is thereby entitled to actual damages, statutory damages not to exceed $1,000, plus costs and attorneys' fees.

**WHEREFORE,** Mr. Brutus respectfully requests that this Honorable Court enter judgment against NCS for:

a.   Statutory damages of **$1,000** pursuant to Section 559.77(2), Florida Statutes;

b.   Actual damages, including damages for loss of credit opportunities, damage to credit scores, and emotional distress pursuant to Section 559.77(2), Florida Statutes;

c.   Injunctive relief prohibiting NCS from trying to collect the bogus debt from Mr. Brutus;

d.   Reasonable costs and attorneys' fees pursuant to Section 559.77(2), Florida Statutes; and

e.   Such other relief that this Court deems just and proper.

## COUNT X
## <u>VIOLATIONS OF THE FCCPA, § 559.72(9), FLA. STAT.</u>
### <u>YES! Communities</u>

197.   Mr. Brutus adopts and incorporates paragraphs 1 – 149 as if fully stated herein.

198.   YES! Communities violated Section 559.72(9), Florida Statutes, when it asserted a debt was legitimate when it knew it was not, by instructing its agent, NCS, to collect a $6,075 "debt" from Mr. Brutus, when YES! Communities was fully aware the debt it sought to collect consisted of nothing but spurious charges

for "damages" which (1) did not occur and (2) Mr. Brutus was not contractually liable for, even if they had occurred.

199.   YES! Communities is liable for the above-stated violations of the FCCPA, and Mr. Brutus is thereby entitled to actual damages, statutory damages not to exceed $1,000, plus costs and attorneys' fees.

**WHEREFORE,** Mr. Brutus respectfully requests that this Honorable Court enter judgment against YES! Communities for:

a.   Statutory damages of $1,000 pursuant to Section 559.77(2), Florida Statutes;

b.   Actual damages, including damages for loss of credit opportunities, damage to credit scores, and emotional distress pursuant to Section 559.77(2), Florida Statutes;

c.   Injunctive relief prohibiting BOA from trying to collect the bogus debt from Mr. Brutus;

d.   Reasonable costs and attorneys' fees pursuant to Section 559.77(2), Florida Statutes; and

e.   Such other relief that this Court deems just and proper.

## COUNT XI
## VIOLATIONS OF THE FDCPA
## NCS Only

200.   Mr. Brutis adopts and incorporates paragraphs 1 – 149 as if fully stated herein.

201.   NCS violated 15 U.S.C. § 1692e and 1692e(10) when NCS used false, deceptive, and misleading representations in connection with the collection of a debt by reporting to at least three nationwide CRAs a $6,075 debt was owed when NCS knew, or should have known, the debt consisted of nothing but spurious, contradictory, and unwarranted charges, which Mr. Brutus did not cause and which never existed, and, even assuming, arguendo, that the damages claimed by YES! Communities existed, Mr. Brutus was not contractually liable for them.

202.   NCS violated 15 U.S.C. § 1692e(2)(a) by using false representations about the character, amount, or legal status of a debt by reporting to at least three nationwide CRAs a $6,075 debt was owed when NCS knew, or should have known, the debt consisted of nothing but spurious, contradictory, and unwarranted charges, which Mr. Brutus did not cause and which never existed, and, even assuming, arguendo, that the damages claimed by YES! Communities existed, Mr. Brutus was not contractually liable for them.

203.   NCS violated 15 U.S.C. § 1692e(8) by communicating credit information which they knew, or should have known, to be false when Mountain

Run reported information to reporting to at least three nationwide CRAs a $6,075 debt was owed when NCS knew, or should have known, the debt consisted of nothing but spurious, contradictory, and unwarranted charges, which Mr. Brutus did not cause and which never existed, and, even assuming, arguendo, that the damages claimed by YES! Communities existed, Mr. Brutus was not contractually liable for them.

204.   NCS violated 15 U.S.C. § 1692f by using unfair methods to collect a debt, when NCS intentionally reported information to the Big Three CRAs that it knew was not accurate, and then illegally parked the Debt on Mr. Brutis's credit report, knowing this would adversely affect Mr. Brutis' credit reports and scores, in order to pressure him to pay a debt which was not owed and likely fabricated.

**WHEREFORE,** Mr. Brutis respectfully requests that this Honorable Court enter judgment against NCS for:

a.   Statutory damages of **$1,000**, pursuant to 15 U.S.C. § 1692k(a)(2)(A);

b.   Actual damages, including damages for loss of credit opportunities, damage to credit scores, and emotional distress pursuant to 15 U.S.C. § 1692k(a)(2)(A);

c.   Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1692k(a)(3); and,

d.   Such other relief that this Court deems just and proper

## COUNT XII
## VIOLATIONS OF  § 83.49(3)(a) FLA. STAT.
## YES! Communities

205.    Mr. Brutus adopts and incorporates paragraphs 1 – 149 as if fully stated herein.

206.    YES! Communities violated Section 83.49(3)(a) Florida Statutes, when it failed to return Mr. Brutus' security deposit of $840 to him when it received notice of dispute within 15 days of notice to impose claim.

207.    YES! Communities violated Section 83.49(3)(a) Florida Statutes, when it failed to return Mr. Brutus' security deposit of $840 to him when it received notice of dispute within 15 days of notice to impose claim.

208.    YES! Communities violated Section 83.49(3)(a) Florida Statutes, when it failed to mail notice of intent to impose claim against Mr. Brutus' $840 security deposit by certified mail, as required by law.

209.    YES! Communities is liable for the above-stated violations of Florida statute, and Mr. Brutus is thereby entitled to his $840 deposit, interest, costs and attorneys' fees.

**WHEREFORE,** Mr. Brutus respectfully requests that this Honorable Court enter judgment against YES! Communities for:

a.      $840 plus interest from the date Mr. Brutus requested return of his deposit.

b.      Reasonable costs and attorneys' fees pursuant to Section 83.49(3)(c)

Florida Statutes; and

c.      Such other relief that this Court deems just and proper

## **<u>JURY TRIAL DEMANDED</u>**

Mr. Brutus hereby demands a trial by jury on all issues so triable.

Respectfully submitted on June 20, 2024, by:

**SERAPH LEGAL, P. A.**

*/s/ Christian E. Cok*
Christian E. Cok Esq.
Florida Bar No.: 1032167
CCok@SeraphLegal.com
*Lead Counsel for Plaintiff*

*/s/ Thomas M. Bonan*
Thomas M. Bonan Esq.
Florida Bar No.: 118103
TBonan@SeraphLegal.com
2124 W. Kennedy Blvd., Ste. A
Tampa, Florida 33606
Tel: 813-567-1230
Fax: 855-500-0705
*Counsel for Plaintiff*

**ATTACHED EXHIBIT LIST**

| | | |
|---|---|---|
| **EXHIBIT A** | **–** | **Photos of Residence Prior to Move-In and Emails to Austin Hayes** |
| **EXHIBIT B** | **–** | **Lease Agreement, March 27, 2019** |
| **EXHIBIT C** | **–** | **Notice to Vacate, February 25, 2022** |
| **EXHIBIT D** | **–** | **Photos of Residence with Improvements** |
| **EXHIBIT E** | **–** | **Statement of Deposit with Damages** |
| **EXHIBIT F** | **–** | Craigslist.com Listing |
| **EXHIBIT G** | **–** | Equifax Consumer Disclosure – May 14, 2023 |
| **EXHIBIT H** | **–** | Experian Consumer Disclosure – October 17, 2023 |
| **EXHIBIT I** | **–** | Trans Union Consumer Disclosure – May 18, 2023 |
| **EXHIBIT J** | **–** | Vystar Credit Counter Offer, May 10, 2023 |

# EXHIBIT A
# Photos of Residence Prior to Move-In and Emails to Austin Hays

5/30/23, 12:36 PM                    Seraph Legal, P.A. Mail - Moved in pictures and conversations, Hidden Oak

Do I need to bring a check, money order or can I just use my debit card?

On Mon, Mar 25, 2019 at 2:09 PM Austin Haynes <ahaynes@yescommunities.com> wrote:
If you dont do it today it's still technically on the market for rent. We dont want someone to take It from ya!

**From:** Jay Brutus <██████████████>
**Sent:** Monday, March 25, 2019 1:54:52 PM
**To:** Austin Haynes
**Subject:** Re: Hidden Oaks

We have decided that we are going to rent it, and if we decide to buy then we will do that later on. Let me know the earliest that we can move in, and I will come by to take care of the security deposit,and any other payments needed.

On Mon, Mar 25, 2019 at 12:42 PM Austin Haynes <ahaynes@yescommunities.com> wrote:

Is there any way we could reschedule for tomorrow evening? The contractor is still finishing up in there today. i was under the impression he was already done but it sounds like he will actually finish this evening.. just let me know. Thank you!


Austin Haynes

Sales and leasing, Hidden Oaks 0526

352.331.4400 – Office

855.507.4687 – Fax

Ahaynes@yescommunities.com

100 Castle Drive Gainesville, FL. 32607

# EXHIBIT A
# Photos of Residence Prior to Move-In and Emails to Austin Hays

probably before 5. I will see if I can drop her and mommy off to the doctors appointments and come by while they are at the doctors.

On Mon, Mar 25, 2019 at 3:19 PM Austin Haynes <ahaynes@yescommunities.com> wrote:
> What time do you think you could make it by ?

Get Outlook for Android

---

**From:** Jay Brutus <████████████████>
**Sent:** Monday, March 25, 2019 3:18:22 PM

**To:** Austin Haynes
**Subject:** Re: Hidden Oaks

I

On Mon, Mar 25, 2019 at 3:08 PM Austin Haynes <ahaynes@yescommunities.com> wrote:
> Around 5

Get Outlook for Android
I will try but little lady has her first doctor appointment at 3:45. I don't know how long they might take with her. We are looking to move in this week. The earliest, the better. I will just bring you $1680, the security deposit and first month rent. Since we are moving in a couple days before the April 1. If you want to prorated those days, I will pay the fees too.

**From:** ████████████████
**Sent:** Monday, March 25, 2019 3:08:05 PM

**To:** Austin Haynes
**Subject:** Re: Hidden Oaks

Yeah, what time your close today?

On Mon, Mar 25, 2019 at 3:01 PM Austin Haynes <ahaynes@yescommunities.com> wrote:
> Would it be possible for you to bring it in today?

Get Outlook for Android

---

**From:** ████████████████
**Sent:** Monday, March 25, 2019 2:48:45 PM

**To:** Austin Haynes
**Subject:** Re: Hidden Oaks

Ok. Thank you for everything and all your help buddy. See you tomorrow.

On Mon, Mar 25, 2019 at 2:23 PM Austin Haynes <ahaynes@yescommunities.com> wrote:
> Money order

Get Outlook for Android

---

**From:** ████████████████
**Sent:** Monday, March 25, 2019 2:11:37 PM

**To:** Austin Haynes
**Subject:** Re: Hidden Oaks

# EXHIBIT A
# Photos of Residence Prior to Move-In and Emails to Austin Hays



On Mon, Mar 25, 2019 at 3:37 PM Jay Brutus <jaybrutus19@gmail.com> wrote:

https://mail.google.com/mail/u/0/?ik=375a532b71&view=pt&search=all&permthid=thread-f:1767252338302806964&simpl=msg-f:1767252338302806964   7/9

# EXHIBIT A
# Photos of Residence Prior to Move-In and Emails to Austin Hays

5/30/23, 12:36 PM                    Seraph Legal, P.A. Mail - Moved in pictures and conversations, Hidden Oak



# EXHIBIT A
# Photos of Residence Prior to Move-In and Emails to Austin Hays



Page **51** of **88**

# EXHIBIT A
# Photos of Residence Prior to Move-In and Emails to Austin Hays

5/30/23, 12:36 PM                    Seraph Legal, P.A. Mail - Moved in pictures and conversations, Hidden Oak



https://mail.google.com/mail/u/0/?ik=375a532b71&view=pt&search=all&permthid=thread-f:1767252338302806964&simpl=msg-f:1767252338302806964   4/9

# EXHIBIT A
# Photos of Residence Prior to Move-In and Emails to Austin Hays

5/30/23, 12:36 PM                    Seraph Legal, P.A. Mail - Moved in pictures and conversations, Hidden Oak



https://mail.google.com/mail/u/0/?ik=375a532b71&view=pt&search=all&permthid=thread-f:1767252338302806964&simpl=msg-f:1767252338302806964   3/9

# EXHIBIT A
# Photos of Residence Prior to Move-In and Emails to Austin Hays



On Wed, Mar 27, 2019 at 12:23 PM Jay Brutus <█████████████> wrote:

# EXHIBIT A
# Photos of Residence Prior to Move-In and Emails to Austin Hays

5/30/23, 12:36 PM                        Seraph Legal, P.A. Mail - Moved in pictures and conversations, Hidden Oak

 Gmail

**Alexander Wilde <awilde@seraphlegal.com>**

---

**Moved in pictures and conversations, Hidden Oak**
1 message

**Jay Brutus** <▮▮▮▮▮▮▮▮▮▮▮>                                    Mon, May 29, 2023 at 1:59 PM
To: Alexander Wilde <▮▮▮▮▮▮▮▮▮▮▮>

---

---------- Forwarded message ---------
From: **Jay Brutus** <▮▮▮▮▮▮▮▮▮>
Date: Mon, Apr 15, 2019 at 10:13 AM
Subject: Please get with maintenance
To: Austin Haynes <ahaynes@yescommunities.com>

Good morning Austin, I have been calling the office every day last week and asking for them to send maintenance to my unit and fix the bathroom in the master bedroom. They keep telling me maintenance is coming but they never come. The bathroom in the master bedroom is leaking and keep flushing all by itself every 3-5 minutes day and night, and it s only getting worse. Also, none of the outside lights/circuit in my unit works. The big one facing the road, the lights/circuit for the front and back doors. I already sent you the pictures about the hole in the back door that my girlfriend is concerning about and think someone can easily break in. I know your busy and probably short staff. Can you please get with the maintenance team and have them react to the following please, especially the bathroom.

# EXHIBIT B
# Lease Agreement – March 27, 2019

### Hidden Oaks

### Rental Home Lease Agreement
### This Lease is Governed by Chapter 83, Florida Statute

**THIS AGREEMENT** made and entered into this 26th day of _March_, _2019_ by and between YES Companies Fred, LLC ("Landlord") and YES Homesales, LLC ("Homes Landlord"); and together with Companies, each a "Landlord" collectively the "Landlords" DBA Hidden Oaks, and _Jocelyn Brutus_, (Tenant(s)).

### Witnesseth

1. Landlords demise, rents and lets to Tenant (s) for 12 months, commencing 03/25/2019, the following manufactured home described premises located in ALACHUA County, Florida:

   Lot: _825_, 825 Victoria Ct, Gainesville, FL  32607

   Year: _2008_,  Make: _CMH MANUFACTURING INC_  Size: _68 x 16_

   Vin No. _WHC016789GA_

2. Rent:  Tenant covenants and agrees to pay to Landlords, without demand, the monthly rent of $829.68, in advance on or before the first day of each calendar month of the rental term.

   A.  Additional Rent:  In addition to the rent listed above, Tenant will pay the following fees, charges and assessments as stated below:

   1)  **NO PETS PERMITTED IN RENTAL HOMES WITHOUT PRIOR MANAGEMENT APPROVAL. IF APPROVED, THERE IS A $35.00 FOR ONE OR $50 FOR TWO PETS, PER MONTH FEE**

   2)  Additional Resident Fee:  **$0.00** per person per day, in excess of the number of individuals permitted to reside in the mobile home pursuant to the Rental Agreement, who resides in the mobile home in excess of 15 consecutive days or a total of 30 days per year.

   3)  Late Payment Fee:  **$25.00** if rent is not **paid in full** by the **5th** day of every month. Additional **$50.00** if rent is not received by the 10th day of the every month. **Total $75.00 if not paid by the 10th.**

   4)  Returned Check Fee:  **$25.00 AND $75.00 LATE FEE ($100.00)** per check returned by the Tenant's financial institution.

   5)  Pest Control Fee:  **5.00** monthly maintenance; Additional required pest control services may be necessary and would be the sole responsibility of the tenant.

   6)  Lawn Mowing and Service Fee:  **$0.00** per Service call for any repair, maintenance or service that is performed by the Park but is the responsibility of Tenant.

   7)  Cleaning Fee:  Tenant agrees to pay Landlords the sum of **$840.00**, of which $100.00 is non-refundable. Landlords acknowledge receipt of this cleaning fee. The Landlords will return the balance of the cleaning fee, less any cleaning or repair cost incurred by Landlords to return premises to as-rented condition, upon the termination of this Agreement, provided that Tenant is not in default under any provision of the Agreement. Landlords shall have a total of 30 days after Tenant vacates the premises to inspect, determine cost to be incurred, if any and mail monies due to Tenant. If Tenant exercises its option to purchase the manufactured home as set forth below, this cleaning fee shall be returned in full.

   8)  Waste Disposal Service: A charge of $ 15.32 per month will be imposed for waste disposal service. Disposal Service Rates can be adjusted if adjusted by the provider.

---

Lease Agreement

# EXHIBIT B
# Lease Agreement – March 27, 2019

3. Failure to pay any of the above fees, charges and assessments when due is a breach of this Agreement and can cause Tenant to be evicted.

4. Occupancy:  In addition to the above-mentioned Tenant(s), premise shall be occupied as a private residence by:

| Name: | Relationship: | DOB: |
|---|---|---|
| Jayson Brutus / *Jaymir Brutus* | Son / Son | 12/15/2014 |
| *Elena S. Brutus / Emiliana Brutus* | Daughter / Daughter | 09/07/2016 |
| *Miranda N. Paez* | Fiancee | 08/12/1985 |

Said premises are to be used exclusively and solely by Tenant as a residence. The premises may not be used to conduct any commercial enterprise or business whatsoever, except as may be provided by the Park's Rules and Regulations. **The Tenant (s) and those occupants listed are the only persons permitted to occupy the manufactured home at SITE # 825.**

5. During the period of the Agreement, Landlords shall retain title to the manufactured home herein, Tenant shall lease both the manufactured home and the underlying lot, 825, 100 Castle Drive, Gainesville, FL 32607, from Landlords. During this Rental Agreement, the provisions of Part II, Chapter 83 Florida Statutes, the Florida Residential Landlord and tenant Act, will govern the parties relationship.

6. Repairs and Alterations: Tenant will pay all "minor repairs" which are defined as those repairs whose total cost is less than **$50.00** (including both labor and materials). Landlords will pay for all other repairs and maintenance, except for those repairs cased by the negligence or intentional destructive acts of Tenant (s) members of Tenant (s) family or persons on the premises with Tenants consent. Tenant is responsible for all cleaning of home inside and out. Tenant will not make or permit to be made any alterations, additions, improvements or changes in the premises without in each case first obtaining the written consent of Landlords. The failure of the Landlords for any reason, to consent in writing to any such alterations, improvements or changes in the premises within 14 days from the date the consent is requested shall be conclusive evidence of Landlords' refusal to consent to the same. Landlords' consent to particular alterations, additions, improvements or changes to the premises shall not be deemed a consent to nor a waiver of restrictions against alterations, additions, improvements or changes.

7. Tenant is required to pay all utilities. Tenant must provide Hidden Oaks with proof deposit has been paid to the respective utility companies listed below before finalizing this lease.

| Electric | GRU |
|---|---|
| Water | GRU |
| Sewer | GRU |
| Trash | Hidden Oaks |

8. Landlords agree to pay all taxes and assessments imposed with respect to the premises.

9. Insurance: Tenant agrees to insure the contents of the manufactured home against fire and casualty losses. Landlords agree only to insure the manufactured home itself against fire and casualty losses. All insurance proceeds from Landlords' insurance policy on the manufactured home shall be exclusively to Landlords' benefit.

10. Tenant shall not assign this Agreement or sublet any part of the premises without the previous written consent of Landlords. The failure of Landlords, for any reason, to provide consent in writing to any such assignment or sublease within 14 days from the date of consent is requested shall be conclusive evidence of Landlords' refusal to consent to same.

# EXHIBIT B
# Lease Agreement – March 27, 2019

11. Landlords covenant that it has the right and authority to rent the premises, and that the Tenant shall have a quiet enjoyment of the premises and shall not be evicted or disturbed in possession of the premise as long as Tenant complies with the terms of this Agreement and the Park's current Rules and Regulations of which a copy has been delivered to Tenant (s) prior to or coincident with execution of this Residential Rental Agreement. At the end of the term, unless Tenant(s) exercise its option to renew or Landlords exercise their option to not renew, Tenant(s) shall quit and deliver up the premises to Landlords in as good as condition as they are now, ordinary wear, decay and damage by the elements expected. If the premises are destroyed substantially by fire, natural disaster or other act of God; or taken by eminent domain, either party may terminate this Agreement without liability for the remainder of the term. A condemnation award shall belong exclusively to Landlords.

12. Tenant agrees that if Tenant fails to pay rent when due for a period exceeding 2 days, Landlords shall be entitled to give immediate Notice of Termination of the Agreement and to commence an action for eviction under Chapter 83, Florida Statutes. Tenant further agrees to pay attorney's fees or cost incurred by Landlords associated with such Notice and Eviction action.

13. Acceleration: Should Tenant default on any provision of this lease, or if eviction is begun under the terms of the Park's Rules and Regulations, Tenant specifically agrees all remaining sums due under this Rental Agreement shall become immediately due and payable to Landlords.

14. Park Rules and Regulations: The parties hereto specifically agree the current park rules and regulations are incorporated herein by reference, and that Tenant shall be bound by those rules and regulations to the same extent as any homeowner would be. Further any future changes to the park's rules and regulations shall be incorporated herein by reference us of the effective date of those changes. Tenant's further agrees and understands that breach of park's rules and regulations shall be grounds for termination of this Agreement and for eviction from the park as provided for in the park's existing rules and regulations.

15. Renewal: The term of this lease shall be for a period of 12 month(s), commencing on the start date above. Thereafter, the rental term shall AUTOMATICALLY RENEW annually for a 12 month period unless either of the parties, the TENANT(s) or the LANDLORDS, notifies the other party in writing 30 days before the expiration of the term of this rental agreement, of their intention not to renew for this lease. If the term is not renewed the lease will convert to a month-to-month term and will be subject to Market Monthly Rental Rate increases without further notice. LANDLORDS will notify TENANT(s) 90 days prior to the automatic renewal date IF the automatic renewal Monthly Rental rate will be adjusted.

16. Termination: Either party may terminate at the end of the term by giving a proper 30 day written notice in advance as set forth in paragraph 15 hereof. Landlords may terminate this lease for non-payment of rent, violation of the Guidelines For Community Living (Rules and Regulations) ("Guidelines") established, or if the Premises shall be deserted or vacated by Resident. The Tenant shall be responsible for payment of liquidated damages of $1,000 as provided in the separate Addendum if the Tenant terminates early or abandons the premises. The Tenant shall pay double the rent for holding over beyond the termination date and may be responsible for attorney fees and costs of the Landlords for filing an action in court to evict the Tenant.

17. This is an "AS-IS" transaction. Tenant is leasing the manufactured home listed herein in "AS-IS" condition. Landlords make no warranties of any nature whatsoever regarding the condition of the home. Tenant further acknowledges that they are entering into this Rental Agreement only after a full and complete inspection of the manufactured home listed herein, and not by reason of any oral representation of Landlords or their agents.

18. Indemnification: Tenant further agrees to indemnify Landlords against loss or liability arising out of Tenant's use of the demised premises, including the park's common property, and further agrees to indemnify Landlords for any harm or damages suffered by any others using the property with Tenant's consent.

# EXHIBIT B
## Lease Agreement – March 27, 2019

19. Right of Entry: Tenant hereby grants to Management the right to enter upon the home at any time without notice for the preservation of the premises, to inspect the premises, to make necessary or agreed repairs, alterations, improvements, to supply agreed services, to exhibit home to prospective purchasers, mortgages, residents workman or contractors, or for any other reasonable business purpose connected with the operation of the Mobile Home Park.

20. Emergencies: Tenant(s) are responsible for the personal safety of their property. Every precaution should be taken to ensure personal safety. In no way is the Mobile Home Park responsible for the personal safety of Tenant(s) possessions. In case of emergency, Tenant should call the proper authority. For medical, fire or civil disturbances call 911.

21. Home inspections for routine maintenance will be conducted on a monthly basis. Tenant will be notified in advance of such inspections.

IN WITNESS WHEREOF, the parties to this Agreement have set their hands and seals on this 27th day of March, 2019

YES Companies Fred, LLC d/b/a Hidden Oaks
_____ Landlord
By: _____
Print Name: Trevor McKeown
Title: Authorized Agent

_____ Witness

YES Homesales, LLC

_____ Homes Landlord
_____ Jocelyn Brutus

_____ Tenant

_____ Tenant

_____ Tenant

# EXHIBIT C
# Notice to Vacate – February 25, 2022



**Hidden Oaks**

**Non-Renewal Home Lease Notice**

February 25, 2022

Jocelyn Brutus
825 Victoria Ct
Gainesville, FL 32607

Dear Jocelyn Brutus,

This letter is to serve notice that your current Lease Agreement for 825 Victoria Ct will expire at midnight on 03/31/2022 and no option for renewal is offered.

You are required to surrender the premises to Hidden Oaks upon lease expiration. Please return the premises in the same condition as you found it upon move-in. You are required to return all keys when vacating the premises. Please note that any personal property left at the premises after you return all keys shall be deemed abandoned, and you hereby release Hidden Oaks from any claims related to such property.

A forwarding address is required at the time of vacating the premises. All correspondence will be mailed to the last known address on file if a forwarding address is not provided. Please contact the Community Office to schedule a move-out inspection. If you are unable to schedule the move-out inspection, a Community Representative will complete the move-out inspection independently. Documentation of the itemized list of damages, if applicable, as well as any security deposit refund due will be sent to you within 30 days of move-out.

Should you have any questions, please contact the community office to discuss.

Sincerely,

Management
YES Communities

Hidden Oaks 100 Castle Drive Gainesville FL 32607 (352) 331-4400 hiddenoaks@yescommunities.com

Rev. 09/01/2021

# EXHIBIT D
## Photos of Property at Move-Out



## EXHIBIT D
## Photos of Property at Move-Out



# EXHIBIT D
## Photos of Property at Move-Out



# EXHIBIT D
## Photos of Property at Move-Out



## EXHIBIT D
## Photos of Property at Move-Out



## EXHIBIT D
## Photos of Property at Move-Out



# EXHIBIT D
## Photos of Property at Move-Out



## EXHIBIT D
## Photos of Property at Move-Out



## EXHIBIT D
## Photos of Property at Move-Out



# EXHIBIT E
# Statement of Deposit with Damages – December 13, 2022



**National**
**Credit Systems, Inc.**

*P.O. Box 672288 Marietta, GA 30006  (800) 459-1539  (404) 629-2728*
*Monday - Thursday 8:00 a.m. - 7:00 p.m., Friday 8:00 a.m. - 5:00 p.m.*

12/13/2022

Atty Adriane Isenberg
912 NORTHWEST 56TH TERRACE SUITE A
Gainesville FL 32605

Our Client: Hidden Oaks MHP
Client Account Number: 825
NCS Account Number: 4901956

Re Your Client: Jocelyn Brutus
Balance:  $6,075.00

Enclosed you will find copies of the documentation on file with National Credit Systems, Inc. pertaining to the above referenced account.

Please have your client remit payment on this account to National Credit Systems, Inc. at the above address.

If you have any questions concerning this documentation or the above referenced account, please contact our office immediately.

Sincerely,

Vincent Fowler
Collection Representative
404-629-2728 or
LTR 62

This communication from a debt collector is an attempt to collect a debt and any information obtained will be used for this purpose.

# EXHIBIT E
# Statement of Deposit with Damages – December 13, 2022

**STATEMENT OF DEPOSIT (SODA)**
Account: 10749221

Property:
Hidden Oaks
100 Castle Drive
Gainesville, FL  32607

Mailing Address:
Jocelyn Brutus

Unit Address:
Jocelyn Brutus
825 Victoria Ct
Gainesville, FL 32607

| | | | |
|---|---|---|---|
| Occupancy Date: | 3/25/2019 | Date Notified:4/4/2022 | Date Prepared: | 4/4/2022 |
| Vacate Date: | 4/2/2022 | | |
| Lease Expiration: | 4/30/2022 | | |

Deposit Summary
Security Deposit: $840.00

Deposits Held: $840.00
Credit Balance: $0.00
Less Applied: -$840.00
Amount Due to Resident: $0.00

**Ledger Detail**

| Date | Type | For | Amount | Balance |
|---|---|---|---|---|
| | [Previous Balance Forward] | | $0.00 | $0.00 |
| 04/01/2022 | Additional Lease Charges | Home Rent | $545.68 | $545.68 |
| 04/01/2022 | Additional Lease Charges | Month to Month Fee - Lease | $100.00 | $645.68 |
| 04/01/2022 | Additional Lease Charges | Pest Control | $5.00 | $650.68 |
| 04/01/2022 | Additional Lease Charges | Trash | $15.77 | $666.45 |
| 04/01/2022 | Rent | Base Rent | $442.00 | $1,108.45 |
| 04/04/2022 | Credit | Home Rent | $-545.68 | $562.77 |
| 04/04/2022 | Credit | Month to Month Fee - Lease | $-100.00 | $462.77 |
| 04/04/2022 | Credit | Pest Control | $-5.00 | $457.77 |
| 04/04/2022 | Credit | Trash | $-15.77 | $442.00 |
| 04/04/2022 | Credit | Base Rent | $-442.00 | $0.00 |
| 04/04/2022 | Adjustment | Forfeit Security Deposit | $100.00 | $100.00 |
| 04/04/2022 | Adjustment | Home Damages | $6,815.00 | $6,915.00 |
| 04/04/2022 | Security Deposit Application | Security Deposit | $-840.00 | $6,075.00 |

**\*\*\* Please note if you are receiving a refund, the check will be sent separately from the bank and is NOT included with this Statement of Deposit \*\*\***

This is a notice of my intention to impose a claim for damages in the amount of $100 Cleaning fee_ upon your security deposit, due to ___Hidden Oaks___.   It is sent to you as required by s. 83.49(3), Florida Statutes. You are hereby notified that you must object in writing to this deduction from your security deposit within 15 days from the time you receive this notice, or I will be authorized to deduct my claim from your security deposit. Your objection must be sent to the property address above.

Dated: ___April 4, 2022___   By: *Veronica D'Houdt*

# EXHIBIT E
# Statement of Deposit with Damages – December 13, 2022

| Hidden Oaks | Comparison Report | April 2, 2022 |
|---|---|---|

| PROJECT | Move Out Inspection | | | PROJECT | Move Out Inspection | |
|---|---|---|---|---|---|---|
| PLACE | Unit 825 / Building 0526 | | | PLACE | Unit 825 / Building 0526 | |
| CLOSED BY | Pedro Rodriguez / Maintenance | RESIDENT | Jocelyn Brutus | CLOSED BY | Pedro Rodriguez / Maintenance | RESIDENT | Jocelyn Brutus |
| CLOSED DATE | April 2, 2022 | STATUS | Closed | CLOSED DATE | April 2, 2022 | STATUS | Closed |
| CREATED ON | April 2, 2022 | REPORTED BY | James Honeysucker | CREATED ON | April 2, 2022 | REPORTED BY | James Honeysucker |
| TOTAL COST | $6,815.00 | SCORE | | TOTAL COST | $6,815.00 | SCORE | |
| TOTAL ACTUAL | . | ESTIMATED | . | TOTAL ACTUAL | . | ESTIMATED | . |
| BUSINESS | . | OPEN | . | BUSINESS | . | OPEN | . |
| AFTER HOURS | . | | | AFTER HOURS | . | | |

**LIVING ROOM & HALL**

| CATEGORY | COST DESCRIPTION | COST PER UNIT | QUANTITY | COST |
|---|---|---|---|---|
| Electrical | Light fixture need replace | $20.00 | 1 | $20.00 |
| Flooring | Living room and 3 bedrooms need carpets replace | $750.00 | 1 | $750.00 |
| Interior | All house need to be painting pace only for paint $100.00 for 5 gallon bucket (this house only need 1 - 5 gallon | $100.00 | 1 | $100.00 |
| Window | ha have blind | $10.00 | 1 | $10.00 |

**KITCHEN & DINING**

| CATEGORY | COST DESCRIPTION | COST PER UNIT | QUANTITY | COST |
|---|---|---|---|---|
| Electrical | Light fixture is rusty | $20.00 | 1 | $20.00 |
| Flooring | Flooring in living room, dining room, kitchen, hallway and bath room need to be replaced (cost is $680.00 only for the vinyl) | $680.00 | 1 | $680.00 |
| Interior | All cabinets and counter top need replace | $1,300.00 | 1 | $1,300.00 |
| | All house need to be painting pace only for paint $100.00 for 5 gallon bucket (this house only need 1 - 5 gallon) | $100.00 | 1 | $100.00 |
| Plumbing | Sink with faucet need replace | $135.00 | 1 | $135.00 |
| Window | Broken blind | $10.00 | 1 | $10.00 |

**BEDROOM 1**

| CATEGORY | COST DESCRIPTION | COST PER UNIT | QUANTITY | COST |
|---|---|---|---|---|
| Electrical | Light fixture is rusty | $20.00 | 1 | $20.00 |
| Flooring | Living room and 3 bedrooms need carpets replace | $750.00 | 1 | $750.00 |

# EXHIBIT E
## Statement of Deposit with Damages – December 13, 2022

**BEDROOM 1**

| CATEGORY | COST DESCRIPTION | COST PER UNIT | QUANTITY | COST |
|---|---|---|---|---|
| Interior | All house need to be painting price only for paint $100.00 for 5 gallon bucket (this house only need 1 - 5 gallon) | $100.00 | 1 | $100.00 |
| Window | No window blind | $10.00 | 1 | $10.00 |

**BATH 1**

| CATEGORY | COST DESCRIPTION | COST PER UNIT | QUANTITY | COST |
|---|---|---|---|---|
| Electrical | Light fixture is rusty | $20.00 | 1 | $20.00 |
| Flooring | Flooring in living room, dining room, kitchen, hallway and bath room need to be replaced (cost is $680.00 only for the vinyl) | $680.00 | 1 | $680.00 |
| Interior | All house need to be painting price only for paint $100.00 for 5 gallon bucket (this house only need 1 - 5 gallon) | $100.00 | 1 | $100.00 |
| Plumbing | No window blind | $10.00 | 1 | $10.00 |

**BEDROOM 2**

| CATEGORY | COST DESCRIPTION | COST PER UNIT | QUANTITY | COST |
|---|---|---|---|---|
| Electrical | Light fixture is rusty | $10.00 | 1 | $10.00 |
| Interior | All house need to be painting price only for paint $100.00 for 5 gallon bucket (this house only need 1 - 5 gallon) | $100.00 | 1 | $100.00 |
| Window | Window blind broken | $20.00 | 1 | $20.00 |

**BATH 2**

| CATEGORY | COST DESCRIPTION | COST PER UNIT | QUANTITY | COST |
|---|---|---|---|---|
| Electrical | Light fixture rusty | $10.00 | 1 | $10.00 |
| Disclaimer | | | | |

# EXHIBIT E
## Statement of Deposit with Damages – December 13, 2022

**BATH 2**

| CATEGORY | COST DESCRIPTION | COST PER UNIT | QUANTITY | COST |
|---|---|---|---|---|
| Flooring | Living room and 3 bedrooms need carpets replace | $750.00 | 1 | $750.00 |
| Interior | All house need to be painting once only for paint $100.00 for 5 gallon bucket (this house only need 1 - 5 gallon) | $100.00 | 1 | $100.00 |
| Plumbing | Window blind broken | $10.00 | 1 | $10.00 |

**BEDROOM 3**

| CATEGORY | COST DESCRIPTION | COST PER UNIT | QUANTITY | COST |
|---|---|---|---|---|
| Electrical | Light fixture rusty | $10.00 | 1 | $10.00 |
| Flooring | Living room and 3 bedrooms need carpets replace | $750.00 | 1 | $750.00 |
| Interior | All house need to be painting once only for paint $100.00 for 5 gallon bucket (this house only need 1 - 5 gallon) | $100.00 | 1 | $100.00 |
| Window | Blind broken | $10.00 | 1 | $10.00 |

**GENERAL**

| CATEGORY | COST DESCRIPTION | COST PER UNIT | QUANTITY | COST |
|---|---|---|---|---|
| Cleaning / Housekeeping | House need cleaning | $130.00 | 1 | $130.00 |
| | | | | **Total:$8,895.00** |

## EXHIBIT F
## Craigslist.com Listing



# $45,000 / 3br - 1152ft² - Remodeled 3/2 For Sale Near Shands & NFRMC! (Hidden Oaks, Gainesville, Florida)





Hidden Oaks - Gainesville's #1 Manufactured Home Community!

HOME MOVE IN READY NOW!



# EXHIBIT F
# Craigslist.com Listing



# EXHIBIT F
# Craigslist.com Listing



# EXHIBIT F
## Craigslist.com Listing



**EXHIBIT G**
**Equifax Consumer Disclosure – May 14, 2023**
**NCS Tradeline, Excerpt**



CREDIT REPORT

_____

JOCELYN BRUTUS

**Report Confirmation**

**3634857994**

# EXHIBIT G
# Equifax Consumer Disclosure – May 14, 2023
# NCS Tradeline, Excerpt

## 10. Collections

Collections are accounts with outstanding debt that have been placed by a creditor with a collection agency. Collections stay on your credit report for up to 7 years from the date the account first became past due. They generally have a negative impact on your credit score.

**Date Reported: May 08, 2023**

| | | | |
|---|---|---|---|
| Collection Agency | NATIONAL CREDIT SYSTEMS INC | Balance Date | May 08, 2023 |
| Original Creditor Name | HIDDEN OAKS MHP | Account Designator Code | INDIVIDUAL_ACCOUNT |
| Date Assigned | Sep 01, 2022 | Account Number | xxxxx 56 |
| Original Amount Owed | $6,075 | Creditor Classification | Rental or Leasing |
| Amount | $6,075 | Last Payment Date | |
| Status Date | May 08, 2023 | Date of First Delinquency | |
| Status | UNPAID | | |

**Comments**

Consumer disputes this account information

**Contact**

NATIONAL CREDIT SYSTEMS INC
3750 NATURALLY FRESH BLVD
ATLANTA, GA 30349
1-404-629-9595

# EXHIBIT H
# Experian Consumer Disclosure – October 17, 2023
# NCS Tradeline, Excerpt

10/17/23, 10:16 AM                          Annual Credit Report - Experian

Prepared For

**JOCELYN BRUTUS**

**Personal & Confidential**

Date Generated   Oct 17, 2023

Report Number ███████████

## At a Glance        **40 Accounts**        **0 Public Records**        **6 Hard Inquiries**

## Personal Information

6 Names          21 Addresses          1 Employers          4 Other Records

Because your personal information is reported by you, your creditors, and other sources, it's typical to see small variations in reported personal information, like names and addresses. For security reasons, many of these items can't be disputed online, but don't worry—they don't affect your credit score.

### Names

| | | | |
|---|---|---|---|
| **JOCELYN BRUTUS**<br>Name ID #30521 | **JOCELYN JAY BRUTUS**<br>Name ID #3590 | **JOSELYN BRUTUS**<br>Name ID #24963 | **JOCELYN BRUTUZ**<br>Name ID #2415 |
| **BRUTUS JOCELYN**<br>Name ID #19894 | **JOCELYN J BRUTUS**<br>Name ID #27890 | | |

https://usa.experian.com/acr/printReport?type=CDI                                    1/72

# EXHIBIT H
# Experian Consumer Disclosure – October 17, 2023
# NCS Tradeline, Excerpt



10/17/23, 10:16 AM                                      Annual Credit Report - Experian

## NATIONAL CREDIT SYSTEMS
POTENTIALLY NEGATIVE

### Account Info

| | |
|---|---|
| Account Name | **NATIONAL CREDIT SYSTEMS** |
| Account Number | **490195X** |
| Account Type | **Collection** |
| Responsibility | **Individual** |
| Date Opened | **09/01/2022** |
| Status | **Collection account. $6,075 past due as of Oct 2023.** |
| Status Updated | **Sep 2022** |
| Balance | **$6,075** |
| Balance Updated | **10/08/2023** |
| Recent Payment | **-** |
| Monthly Payment | **-** |
| Original Balance | **$6,075** |
| Highest Balance | **-** |
| Terms | **1 Months** |
| On Record Until | **Jan 2029** |

### Payment History

| | J | F | M | A | M | J | J | A | S | O | N | D |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2023 | C | C | C | C | C | C | C | C | C | C | — | — |

C   Collection

https://usa.experian.com/acr/printReport?type=CDI                                    36/72

Page **82** of **88**

# EXHIBIT H
# Experian Consumer Disclosure – October 17, 2023
# NCS Tradeline, Excerpt

10/17/23, 10:16 AM                                              Annual Credit Report - Experian

**Payment history guide**

Collection as of Oct 2023, Oct 2023, Sep 2023, Sep 2023, Sep 2023, Sep 2023, Aug 2023, Aug 2023, Aug 2023, Aug 2023, Jul 2023, Jul 2023, Jul 2023, Jul 2023, Jun 2023, May 2023, Apr 2023, Mar 2023, Feb 2023, Jan 2023

This account is scheduled to continue on record until Jan 2029.

**Balance Histories**

| Date | Balance | Scheduled Payment | Paid |
|------|---------|-------------------|------|
| **Sep 2023** | **$6,075** | **$0** | **$0** |
| **Aug 2023** | **$6,075** | **$0** | **$0** |
| **Jul 2023** | **$6,075** | **$0** | **$0** |
| **Jun 2023** | **$6,075** | **$0** | **$0** |
| **May 2023** | **$6,075** | **$0** | **$0** |
| **Apr 2023** | **$6,075** | **$0** | **$0** |
| **Mar 2023** | **$6,075** | **$0** | **$0** |

**Additional info**

The original amount of this account was $6,075

**Historical Info**

Original Creditor          **HIDDEN OAKS MHP**

**Contact info**

Address                    PO BOX 312125,
                           ATLANTA GA 31131

Phone Number               (404) 629-9595

**Comment**

**Current:**

Account information disputed by consumer (Meets requirement
of the Fair Credit Reporting Act).

**Previous:**

# EXHIBIT H
# Experian Consumer Disclosure – October 17, 2023
# NCS Tradeline, Excerpt



# EXHIBIT I
# Trans Union Consumer Disclosure – May 18, 2023
# NCS Tradeline, Excerpt

Personal Credit Report for:
JOCELYN BRUTUS

File Number:

Date Created:
05/18/2023

Visit transunion.com/dispute to start a dispute online.

## 🅰 Personal Information

You have been on our files since 03/30/2009. Your SSN has been masked for your protection.

**Credit Report Date**
05/18/2023

**Social Security Number**

**Date of Birth**

**Name**
JOCELYN BRUTUS

## Addresses

**Current Address**

**Date Reported**
05/18/2022

**Other Address**

**Date Reported**
12/05/2018

**Other Address**

## EXHIBIT I
## Trans Union Consumer Disclosure – May 18, 2023
## NCS Tradeline, Excerpt



| | |
|---|---|
| **Address** | PO BOX 312125 ATLANTA, GA 31131-2125 |
| **Phone** | (404) 629-9595 |
| **Date Opened** | 09/01/2022 |
| **Responsibility** | Individual Account |
| **Account Type** | Open Account |

# EXHIBIT I
# Trans Union Consumer Disclosure – May 18, 2023
# NCS Tradeline, Excerpt

| | |
|---|---|
| **Loan Type** | COLLECTION AGENCY/ATTORNEY |
| **Balance** | $6,075 |
| **Date Updated** | 05/13/2023 |
| **High Balance** | $6,075 |
| **Original Creditor** | HIDDEN OAKS MHP |
| **Past Due** | $6,075 |
| **Pay Status** | >Collection< |
| **Estimated month and year this item will be removed** | 03/2029 |
| **Remarks** | Account information disputed by consumer (FCRA); >PLACED FOR COLLECTION< |

## Satisfactory Accounts

The following accounts are reported with no adverse information. For your protection, your account numbers have been partially masked, and in some cases scrambled. Please note: Accounts are reported as "Current; Paid or paying as agreed" if paid within 30 days of the due date. Accounts reported as Current may still incur late fees or interest charges if not paid on or before the due date.



# EXHIBIT J
# Vystar Credit Counter Offer – May 10, 2023



P.O. Box 45085 • Jacksonville, Florida 32232-5085 • (904) 777-6000 or 1-800-445-6289 • www.vystarcu.org

To whom it may concern:

This is to inform you that  MR JOCELYN BRUTUS  has an account with VyStar Credit Union:

Mr. Brutus did a loan request on 05/10/2023  and was approved for a counter-offer, because of a collection:

NATL CRSYS:  Opened:  09/2022
Amount $6,075.00

Original creditor:  Hidden Oaks

Should you have any questions regarding this notice, please contact a VyStar Call Center Representative at (904) 777-6000, option 9 or (800) 445-6289, option 9. Our Call Center, as well as VyChat, is available Monday through Sunday from 7:00 a.m. to 7:00 p.m.

Sincerely,

Alyssa Harris